# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

THERESA M.,

        Plaintiff,

v.

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

Case No. 19 C 3135

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Theresa M.[1] seeks judicial review of the final decision of the Commissioner of Social Security finding her ineligible for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, Theresa's motion [13] is granted in part and denied in part, the Commissioner's motion [22] is denied, and the ALJ's decision is reversed and this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

## BACKGROUND

While walking up some stairs on November 30, 2015, Theresa fell directly on her left knee, causing a tibial plateau fracture. (R. 396, 400). The next day Theresa underwent Open Reduction and Internal Fixation (ORIF) surgery. *Id.* at 413-15. Theresa's knee surgery was followed immediately by intensive inpatient rehabilitation, and then months

---

[1] Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff by her first name and the first initial of her last name or alternatively, by first name.

of physical therapy. *Id.* at 421-575, 593-609, 622-649. Theresa continued to experience pain in her knee, and in May 2016, she was diagnosed with depression. *Id.* at 1083. According to Theresa, she became depressed after her surgery when she continued to experience pain and swelling, as she felt her knee was not healing correctly. *Id.* at 22, 26. In addition, Theresa has been diagnosed with asthma, hypertension, osteoarthritis of both hands, and obesity. *Id.* at 1044, 1053, 1079. Theresa's treatment for those ailments has included office visits, the obtaining of medical scans, physical therapy, knee injections, and prescription medications, such as albuterol, pantoprazole, and tramadol. *See, e.g.*, *id.* at 391-92, 593-609, 622-649, 1034-38, 1045.

Theresa filed for a period of disability and disability insurance benefits on January 21, 2016, alleging disability beginning November 30, 2015. (R. 51). Theresa's claim was initially denied on April 25, 2016 and upon reconsideration on June 1, 2016. *Id.* at 51, 58. Upon Theresa's written request for a hearing, she appeared and testified at a hearing held on December 13, 2017 before ALJ Carla Suffi. *Id.* at 12-45. At the hearing, the ALJ heard testimony from Theresa and a vocational expert, Ms. Jewell. *Id* at 895-906.

On March 29, 2018, the ALJ issued a decision denying Theresa's application for disability benefits. (R. 62-69). The opinion followed the required five-step evaluation process. 20 C.F.R. § 404.1520. At step one, the ALJ found that Theresa had not engaged in substantial gainful activity from November 30, 2015, the alleged onset date, through December 31, 2015, the last insured date. *Id.* at 64. At step two, the ALJ found that Theresa had the severe impairments of obesity, right knee patellar tendonitis, and left tibial plateau fracture status post open reduction and internal fixation. *Id.* At step three, the ALJ determined that Theresa did not have an impairment or combination of impairments that

met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). *Id*. at 65.

The ALJ then concluded that Theresa retained the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a), except:

> The claimant could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. She could never climb ladders, ropes, or scaffolds. The claimant could never use the bilateral lower extremities for the operation of foot controls, and she may have required a cane for ambulation. The claimant could sit for 30-45 minutes at a time but then required the ability to walk for five to ten minutes before resuming sitting.

(R. 66). The ALJ next determined, at step four, Theresa was capable of performing her past relevant work as a director in media marketing. *Id.* at 67. Because of this determination, the ALJ found that Theresa was not disabled. *Id*. at 68. The Appeals Council denied Theresa's request for review on March 5, 2019, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-3; *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018).

## DISCUSSION

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine disability within the meaning of the Social Security Act, the ALJ conducts a sequential five-step inquiry, asking: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the claimant's impairment meet or equal an impairment specifically listed in the regulations? (4) Is the claimant unable to perform

3

a former occupation? and (5) Is the claimant unable to perform any other work in the national economy? *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski*, 760 F.2d at 162 n.2.

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In reviewing an ALJ's decision, the Court may not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (internal quotation marks and citation omitted). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge from the evidence and h[is] conclusion[s]." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation and quotations omitted); *see also Fisher v. Berryhill*, 760 F. App'x 471, 476 (7th Cir. 2019) (explaining that the "substantial evidence" standard requires the building of "a logical and accurate bridge between the evidence and conclusion"). Moreover, when the ALJ's "decision lacks evidentiary support or is so

poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

The ALJ found Theresa not disabled at step four of the sequential analysis because she retains the RFC to perform her past relevant work as a director in media marketing. Theresa argues that, because there was no medical opinion as to her impairments, the record "cried out for clarification." Doc. [14] at 11. Along those same lines, Theresa asserts that at least one of the ALJ's RFC limitations, while "ostensibly generous," appeared to be "plucked out of thin air." *Id.* at 12. The Court agrees. [2] Specifically, the Court finds that the absence of any medical opinions in this case resulted in an evidentiary deficit, which the ALJ filled with her lay interpretations of Theresa's X-rays. The ALJ further failed to build the accurate and logical bridge from the medical evidence to her RFC, particularly with respect to the seemingly generous postural limitations, including the sit/walk option and limiting Theresa to occasional kneeling, crawling, and stair-climbing. Accordingly, for the reasons discussed below, the ALJ's decision must be reversed.

**A.  Evidentiary Deficit**

Given the absence of medical opinion evidence in this case, Theresa argues that the ALJ should have sought a medical expert regarding the severity of her limitations. Doc. [14] at 11.

"Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110–11, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000) (citation omitted). The ALJ has a duty to develop the medical record by requesting

---

[2] Because the Court remands on this basis, the Court does not address Theresa's other arguments.

evidence from the claimant's medical sources. 20 C.F.R. § 404.1512(b). If the ALJ is unable to properly evaluate the medical evidence in the record, the regulations provide options for the ALJ to pursue, including requesting additional records, recontacting the treating physician, and ordering a consultative examination. *See* 20 C.F.R. § 404.1520b(b). An ALJ's decision to call a medical expert to testify is discretionary, *see* 20 C.F.R. § 404.1513a(b)(2), and the obtaining of a medical expert is only required "when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

At any rate, an ALJ "may not 'play doctor' by using [her] own lay opinions to fill evidentiary gaps in the record." *Chase v. Astrue*, 458 F. App'x 553, 557 (7th Cir. 2012) (citations omitted). And while it is the claimant's "burden to present medical evidence supporting her claim of disability," *Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014), if there are gaps in the record, "it [i]s the ALJ's responsibility to recognize the need for further medical evaluations . . . before making her residual functional capacity and disability determinations." *Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010).[3]

Here, the ALJ determined which of Theresa's numerous impairments was severe, conducted a listing analysis, and crafted a sedentary RFC with specific accommodations, all without the benefit of a single medical opinion in the record. The state agency physicians determined that there was insufficient evidence to evaluate Theresa's disability,

---

[3] The Commissioner argues that Theresa could have sought an opinion from a treating physician and suggests that the ALJ was free to assume that Theresa, who was represented by counsel at the hearing, made the strongest case for benefits. Doc. [23] at 5. While the ALJ is free to make that assumption, the ALJ nevertheless has a duty to develop the record, and courts in this circuit have remanded for the failure to develop the record, even when the claimant was represented by counsel at the hearing. *See, e.g.*, *Ray v. Bowen*, 843 F.2d 998, 1006 (7th Cir. 1988); *Suide*, 371 Fed. Appx. at 690.

and none of Theresa's treating physicians offered an opinion as to Theresa's disability. (R. 49, 56). Although it is the ALJ's province to construct an RFC, and the ALJ need not rely on a medical opinion to do so, *see Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007), the record here was inadequate to evaluate Theresa's functional capabilities.

In particular, it was not clear from the medical record, how the combination of Theresa's obesity and knee impairments would affect her ability to sustain fulltime employment. To show that Theresa was disabled as the result of her impairments, Theresa had to show that she had an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). Theresa fractured her knee on November 30, 2015, had her surgery on December 1, 2015, underwent intensive rehabilitation for about a week and a half, and then participated in physical therapy around three times a week for months following her surgery. (R. 413-15, 421-575, 593-609, 622-649). While the medical records documenting Theresa's rehabilitation and physical therapy up to June 2016, approximately seven months following her injury, show Theresa's continual pain and difficulties with sitting and standing for long periods of time, squatting, stair-climbing, as well as her total inability to kneel, (R. 642-43), it is unclear how Theresa's recovery progressed after June 2016. By the Court's review, the only other subsequent documents speaking to Theresa's knee surgery recovery are a handful of X-rays and a July 2016 treatment record reflecting Theresa's pursuit of a second opinion after being offered total knee replacement surgery. *Id.* at 1016-18, 1029-30. But those records, on their own, do not speak directly to Theresa's

ability to sit for long periods of time, nor her ability to climb stairs, kneel, or crawl, in light of the combination of her impairments.

The ALJ attempted to fill that void with her lay interpretations of Theresa's knee x-rays, but it was improper for her to do so. "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018). *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) ("[T]he ALJ seems to have succumbed to the temptation to play doctor when she concluded that a good prognosis for speech and language difficulties was inconsistent with a diagnosis of mental retardation because no expert offered evidence to that effect here."); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

In *Akin v. Berryhill*, the ALJ interpreted MRI results that became part of the record after the state agency physicians had already completed their review. 887 F.3d 314, 317 (7th Cir. 2018). The ALJ determined on his own that the MRI results were "consistent" with the claimant's impairments and then based the RFC on the ALJ's consideration of the recent MRIs. *Id.* The Seventh Circuit determined that "without an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment." *Id.* According to the *Akin* Court, the MRI results "may [have] corroborate[d] Akin's complaints, or they may [have] len[t] support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of an expert opinion." *Id.* at 317-18. The

8

Seventh Circuit consequently remanded the case "because the ALJ impermissibly interpreted the MRI results himself." *Id.* at 318.

In a similar case, *Hughes v. Berryhill*, the ALJ found it "significant" that the x-ray of the claimant's knees showed an impression of " 'only mild' bilateral patellofemoral joint space narrowing suggestive of early degenerative change." No. 17 C 5468, 2018 WL 3647112, at *8 (N.D. Ill. Aug. 1, 2018). The ALJ then concluded that the x-ray was "not consistent with the claimant's extreme complaints of pain and limitation which included a statement that she had extreme pain after climbing the stairs every morning." *Id.* The *Hughes* Court determined that, "[w]ithout an expert opinion from a medical source," the ALJ was "not qualified to conclude that mild bilateral patellofemoral joint space narrowing [was] inconsistent with [the claimant's] complaints of knee pain and limitation." *Id.* at *9. As a result, the court remanded the decision and ordered that the ALJ on remand seek an expert opinion as to whether the x-ray of the claimant's knees revealed abnormalities that would result in the level of functional limitations alleged. *Id.*

In this case, the ALJ initially referred to the imaging conducted for Theresa's knees to conclude at Step Three that no listing was met, as "imaging shows prior fractures have healed." (R. 65). The ALJ next discounted Theresa's credibility in light of the x-rays, stating that her allegations were inconsistent with the record "because medical imaging and treatment notes show that the claimant did relatively well following surgery to address her left knee fractures." *Id.* at 67. The ALJ elaborated that "x-ray imaging following the surgery showed good alignment and progressive healing, and repeat imaging done about a year and a half following the injury showed findings consistent with an old healed fracture but well maintained joint spaces and no evidence of malalignment." *Id.* (citations omitted).

Further along in her RFC analysis, the ALJ reiterated that x-ray imaging following Theresa's surgery showed "good alignment and progressive healing," and emphasized the May 2017 x-ray, which the ALJ stated "showed findings consistent with an old healed fracture including only a slight deformity with minimal residue impaction at the lateral tibial plateau" with "no evidence [of] an acute fracture or malalignment" and "joint spaces [ ] well maintained." *Id.* Finally, in summary, the ALJ concluded that her RFC assessment was "supported by the claimant's history of bilateral knee impairments but good overall response to treatment as seen on x-ray imaging as well as through the absence of a need for specialized pain management care. *Id.*

Applying the concepts of *Akin* and *Hughes* here, the ALJ was not permitted to base her RFC on her lay interpretations of Theresa's x-rays, nor interpret the significance of Theresa's X-rays without the assistance of an expert opinion, in order to fill the evidentiary gap in the record. The ALJ was, of course, permitted to summarize the x-rays in her brief discussion of the medical history; accurate paraphrasing of the "impressions" listed in x-ray files is not the Court's concern. *See Brown v. Barnhart*, 298 F. Supp. 2d 773, 791 (E.D. Wis. 2004) (holding ALJ did not play doctor by rephrasing the impression of a physician who reviewed the MRI); *Michael B. v. Berryhill*, No. 18 C 236, 2019 WL 2269962, at *7 (N.D. Ill. May 28, 2019) (finding ALJ did not play doctor by citing to an MRI and summarizing the radiologist's conclusions). But the ALJ took one step further here, a step that runs afoul of the holdings in *Akin* and *Hughes*, when the ALJ concluded that the x-rays meant that Theresa had "good overall response to treatment," and that the x-rays supported the ALJ's RFC. That is, the ALJ did not simply paraphrase the impressions of the x-rays, she further interpreted those x-rays as a lay person to mean that Theresa

recovered from her surgery, and that the sedentary RFC laid out by the ALJ was consistent with those x-rays.

It is reasonable to think that x-rays with impressions discussing "interval healing" and "adequate alignment" meant that Theresa was doing well after her surgery and could sustain full time employment as spelled out in the ALJ's RFC. (R. 312, 1035). However, as the courts in this circuit have held on numerous occasions, it is for doctors, and not ALJs to interpret x-rays, MRIs, and other raw medical data, even if those scans appear to be mild or unremarkable. *See, e.g.*, *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014), *as amended on denial of reh'g* (Oct. 24, 2014) (ALJ's "mistaken reading" of claimant's "unremarkable" MRI "illustrate[d] why ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves."). As the Seventh Circuit has warned, "[c]ommon sense can mislead; lay intuitions about medical phenomena are often wrong." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). Theresa's doctors could have been using x-rays to rule out a complication of her surgery as the cause of her continual pain. The fact that the x-rays list impressions about Theresa's knee hardware remaining in place does not mean that she did not have disabling pain, nor that she would be able to sit for long periods of time with a sit/walk option, knee, crawl, or stair-climb. In fact, the record indicates that Theresa's doctors continued to treat her for knee pain, and even offered up knee replacement surgery as an option, despite some of the seemingly unremarkable x-rays. (*See* R. 593-609, 622-649, 1029-30, 1079).

In addition to the lay x-ray interpretations, the ALJ improperly concluded that "the absence of a need for specialized pain management care" supported the ALJ's RFC and finding that Theresa had a good overall response to treatment. (R. 67). As an initial matter,

11

it is not clear that there actually was an absence of a need for specialized pain management care. The record actually demonstrates the opposite. Theresa engaged in physical therapy to manage her pain for months following her surgery. *Id.* at 593-609, 622-649. The record also indicates that Theresa's orthopedic surgeon administered pain shots for Theresa's knees, and that Theresa took pain medication to regulate her pain. *Id.* at 1029, 1045. Even if it were the case that Theresa was not receiving specialized pain management care, it is for a medical expert, not the ALJ, to conclude that the lack of treatment meant Theresa had recovered well from her surgery.

In sum, because there was no medical opinion offered in this case, the record was inadequate, particularly with respect to Theresa's recovery from surgery, and how Theresa's post-surgery knee impairments—when combined with obesity and her other impairments—would impact her ability to work. The ALJ attempted to fill in the gap with her lay conclusion that the X-rays and purported lack of specialized pain management showed that Theresa responded well to her treatment. The ALJ was not qualified to draw that conclusion. As a result, remand is necessary so that the ALJ can call an expert to review the x-rays and other treatment records to determine Theresa's functional capabilities.

### B. Accurate and Logical Bridge for the Physical RFC

Theresa contends that the ALJ's "ostensibly generous inclusion in the RFC assessment of a sit/walk exception . . . was plucked out of thin air." Doc. [14] at 12. An ALJ must construct an "accurate and logical bridge" between the ALJ's recitation of medical evidence and the decision to account for impairments in the RFC. *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008). In other words, if the Commissioner's decision lacks

evidentiary support or adequate discussion of the issues, it cannot stand. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Thus, if an ALJ fails to explain and support her RFC conclusions, the "omission in itself is sufficient to warrant reversal." *Briscoe*, 425 F.3d at 352.

Without a medical opinion this case, the ALJ was left only with medical records and Theresa's testimony to formulate the RFC. Again, it is the ALJ's duty to formulate the RFC, *see Schmidt*, 496 F.3d at 845, so the lack of medical opinion evidence, alone, is not fatal. The problem here is that the ALJ failed to explain and support her RFC conclusions. *See Briscoe*, 425 F.3d at 352. That is, the ALJ's fleeting RFC analysis does not shed light on how the ALJ came up with the seemingly charitable sit/walk option, nor the other accommodations in the RFC.

The ALJ did not explain how all the RFC limitations she formulated were supported by the medical or other evidence. Beginning with the sit/walk issue raised by Theresa, the ALJ found that Theresa "could sit for 30-45 minutes at a time but then required the ability to walk for five to ten minutes before resuming sitting." (R. 66). Reading between the lines of the ALJ's opinion, the Court can surmise that the ALJ offered the limitation as a partial acceptance of Theresa's testimony that she could sit for no longer than an hour without needing to get up or lie down, and the Commissioner claims as much. *See* Doc. [23] at 8. However, the ALJ did not point to any evidence in the record indicating that such a sit/walk option would be suitable for Theresa.[4] Theresa further rejected a similar sit/stand option

---

[4] The Commissioner highlights that the ALJ pointed out treatment notes from seven months after Theresa's surgery showing the Theresa had normal coordination and balance but that she used a cane. Doc. [23] at 6. True, but simply noting that treatment record does not explain how the ALJ determined that a sit/walk option was appropriate for Theresa. After all, "summary is not analysis." *Giboyeaux v. Saul*, No. 219CV00076JVBSLC, 2020 WL 439943, at *9 (N.D. Ind. Jan. 9, 2020), *report and recommendation adopted sub nom. Celia G. v. Saul*, No. 2:19-CV-76-JVB-SLC, 2020

13

presented to her in her testimony, because she stated that lying down, with the weight off her knees, provided the most relief. (R. 30-31). Although the ALJ explained that she did not find support in the record for Theresa's need to lie down throughout the day, *see id.* at 67, the ALJ did not explain how the medical evidence demonstrated that walking for five to ten minutes every 30 to 45 minutes would accommodate Theresa's impairments.

Further, there is plenty of evidence in the record indicating that Theresa struggled to walk and used a cane to get around. (*See*, *e.g.*, R. 575, 592, 594, 595, 607, 1030, 1073, 1079). For instance, the latest objective physical therapy assessment in the record from June 2016 illustrated that Theresa had "[d]ifficulty with prolonged sitting/standing, walking, squatting, stair climbing," and that she was "[u]nable to kneel." *Id.* at 642-43. Yet the ALJ failed to mention the findings from Theresa's physical therapy assessments, even though those assessments contradicted the ALJ's RFC. "ALJs need not address every piece of evidence in the record, but an ALJ may not ignore an entire line of evidence contrary to her ruling." *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020) (citations omitted). In other words, the ALJ " 'must confront the evidence that does not support her conclusion and explain why that evidence was rejected.' " *Taylor v. Colvin*, 829 F.3d 799, 802 (7th Cir. 2016) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014)). By failing to point to medical evidence supporting the sit/walk option and by neglecting to confront the evidence that did not support the sit/walk option, the ALJ failed to construct an accurate and logical bridge from the evidence to her conclusion.

---

WL 439974 (N.D. Ind. Jan. 28, 2020). The ALJ therefore failed to explain and support her sit/walk option.

14

The ALJ likewise failed to explain and support her decision to allow for stooping, kneeling, crouching, crawling, and climbing ramps and stairs at the occasional level, which could be up to one third of the work day. SSR 83-10, 1983 WL 31251 at *5-6. In her Step Three listing analysis, the ALJ stated generally that Theresa's "obese bodily habitus contributed to limiting her to a range of sedentary exertional level work that included postural limitations." (R. 66). But beyond that generic statement, the Court can find no explanation of why the ALJ crafted an RFC with occasional stooping, kneeling, crouching, crawling, and step climbing. Time and time again, the objective assessments taken of Theresa during physical therapy showed that she struggled with those activities. Most prominently, the physical therapy records show that Theresa was unable to kneel and that she struggled with stair climbing. *See id.* at 607, 624, 636, 643. If Theresa was assessed as being unable to kneel and having difficulty with stair climbing, it seems unlikely that she would be able to stoop, crouch, and crawl, even at the occasional level. In any event, the ALJ did not explain—beyond the unhelpful obesity conclusion—how the record supported Theresa's ability to stoop, kneel, crouch, crawl, or climb ramps and stairs. And as with the sit/walk option, the ALJ did not discuss the physical therapy records and other medical records contradicting those postural activities. The requisite bridge is therefore lacking for the RFC finding regarding these postural activities as well.

The final head-scratcher in the ALJ's RFC is the limitation that Theresa "may have required a cane for ambulation." (R. 66). It is undisputed that Theresa used a cane or other assistive device, such as one or more crutches, to get around following her surgery in 2015. *See, e.g.*, *id.* at 607, 608, 623, 642, 1030, 1077, 1083. The ALJ does not point to any evidence in the record or discuss why she doubted Theresa's need for a cane. The cane

15

restriction is also confusingly worded. The Court cannot trace the ALJ's logic and does not find that the "may have" language is supported.

The Commissioner claims that the ALJ's RFC finding was "comprehensive," and that Theresa has failed to assert any accommodations the ALJ failed to include. Doc. [23] at 1. According to the Commissioner, Theresa simply cites to physical therapy notes listing postural and exertional limitations that are not inconsistent with the ALJ's RFC finding. *Id.* at 9. The Commissioner misunderstands Theresa's argument, which is that, given the combination of her bilateral knee impairments, asthma, morbid obesity, and history of back surgeries, Theresa could not be expected to balance, stoop, kneel, crouch, crawl, and climb ramps and stairs for up to one third of the day. *See* Doc. [14] at 12. So although the argument could have been more directly stated, the Court takes Theresa to mean that the occasional postural activities were not supported by the record. For the reasons above, the Court agrees. Theresa further argued explicitly in her brief that she required a sit-lie down option, rather than a sit-walk option, so she did assert an accommodation that the ALJ failed to include. *Id.* Additionally, a closer look at the physical therapy records, also discussed above, show that those records are indeed *inconsistent* with the ALJ's RFC, especially with respect to their repeated assessment that Theresa could not kneel and struggled to stair-climb. (R. 607, 624, 636, 643). The Commissioner's argument thus falls short.

The Commissioner also contends that the RFC showed a "generous acceptance" of Theresa's subjective allegations, "given the unremarkable medical record[.]" Doc. [23] at 2. To begin, the Court is not sure how Theresa's knee surgery, followed by intensive rehabilitation and months of physical therapy constitutes an unremarkable record,

16

particularly when that impairment is analyzed in conjunction with Theresa's obesity and other impairments. More importantly, even if some of the RFC limitations seemed generous, the ALJ still needed to explain and support those limitations in her decision, in order to build the requisite accurate and logical bridge from the evidence to her conclusions. Furthermore, with respect to the evidentiary gap discussed in the prior section, the ALJ is not allowed to use lay opinions to fill voids in the record, even if the resulting RFC seems generous. The Court therefore finds that the Commissioner's argument does not save the ALJ's faulty analysis here.

**C.    Harmless Error**

Although not briefed by either party, the Court next considers whether Theresa was harmed by the ALJ's errors in failing to develop the record and failing to explain and support the RFC. An error is harmless when it is "predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). The harmless error analysis is "prospective—can we say with great confidence what the ALJ would do on remand"— and not "an exercise in rationalizing the ALJ's decision." *McKinzey v. Astrue,* 641 F.3d 884, 892 (7th Cir. 2011). Here, if the ALJ had called an expert to assess Theresa's disability, it is possible that the expert could have found that the x-rays and other medical records supported Theresa's allegations. It is also possible that the medical expert could have agreed with the ALJ's lay readings of those images. Regardless, the Court cannot say with great confidence that the ALJ would reinstate its decision if the ALJ had the assistance of a medical expert to evaluate Theresa's medical record. Much in the same way, the Court

is not certain that the decision would be the same if the ALJ had properly endeavored to explain and support her RFC restrictions. As a result, the Court finds that the errors committed by the ALJ do not constitute harmless ones in this case.

On remand, the ALJ must consult a medical expert to review the medical records and assist the ALJ in formulating an RFC opinion. Even if the ALJ decides to give lesser weight to the medical expert's opinion, the ALJ must be sure to support and explain her RFC decision, so that the reviewing court can understand the limitations and postural allowances included.

## **CONCLUSION**

For these reasons, Theresa's motion for summary judgment [13] is granted in part and denied in part, and the Commissioner's motion for summary judgment [22] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion. The Clerk is directed to enter judgment in favor of Plaintiff and against Defendant Commissioner of Social Security.

**SO ORDERED.**

Dated: December 23, 2020

                                                Sunil R. Harjani
                                                United States Magistrate Judge